UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| MICHAEL HALE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 1:23-cv-00407-MPB-MKK |
| ) | |
| CENTURION HEALTH SERVICES, LLC, ) | |
| JASON CARTER Dr., ) | |
| SHANNON MCCORD Nurse, ) | |
| DODD Nurse, ) | |
| ) | |
| Defendants. ) | |

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
AND DIRECTING ENTRY OF FINAL JUDGMENT**

Plaintiff Michael Hale brought this civil action against Defendants Centurion Health of Indiana, LLC[1] ("Centurion"), Dr. Jason Carter, Nurse Shannon McCord, and Nurse Mykenzie Dodd[2] alleging they were deliberately indifferent when they provided inadequate medical care for his injured shoulder, in violation of the Eighth Amendment. Dkts. 20; 27. Defendants have moved for summary judgment. Dkt. [106]. Mr. Hale moved to dismiss their summary judgment motion, which the Court construes as a motion to strike. Dkt. [125]. Mr. Hale has also moved for an expedited ruling on preliminary injunctive relief. Dkt. [137]. For the reasons below, Defendants' motion is **granted** and Mr. Hale's motions are **denied**.

---

[1] The clerk **is directed** to correct Defendant "Centurion Health Services, LLC" to "Centurion Health of Indiana, LLC." Dkt. 107.
[2] The clerk **is directed** to correct Defendant "Nurse Dodd" to "Nurse Mykenzie Dodd." *Id.*

1

# I.
# Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
## Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Mr. Hale and draws all reasonable inferences in his favor. *Khungar*, 985 F.3d at 572–73.

### A. Parties

At all times relevant to this matter, the following is true. Mr. Hale was in the custody of the Indiana Department of Correction ("IDOC"). Dkt. 27 at 2. Defendant Centurion provided medical services to the IDOC. *Id.* at 7. Defendants Dr. Carter, Nurse McCord, and Nurse Dodd were employed by Centurion. *Id.* at 10.

### B. Mr. Hale's Medical Care for Shoulder Injury

#### a. Correctional Industrial Facility

On October 6, 2021, Mr. Hale's left shoulder was injured in an altercation with another inmate at Correctional Industrial Facility ("CIF"). Dkt. 41-1 at 3. He was examined by Nurse Dodd after arriving to the medical unit, reporting significant pain and the belief his shoulder was dislocated. *Id.* Nurse Dodd agreed, and medical staff completed transportation paperwork. *Id.* Because Mr. Hale was stable, no emergency vehicle was used. *Id.* Mr. Hale was transported to the emergency room at St. Vincent Anderson Regional Hospital approximately two hours later. *Id.* at 4-5. There, non-party Dr. Tasker diagnosed him with a "closed fracture of proximal end of left humerus" and instructed Mr. Hale to leave his left arm in a sling, use ice, avoid weightbearing on that arm, follow up with an orthopedic specialist in five to six days, and take pain and nausea medication as prescribed. *Id.* at 5.

The next day, Nurse McCord noted that Mr. Hale was noncompliant with wearing his sling at multiple times. Dkt. 123-1 at 4-6. A non-party nurse noted the same the following day, stating Mr. Hale reported discomfort wearing it but was told of the importance of keeping it on. *Id.* at 10.

On October 11, Mr. Hale was seen by non-party Dr. Jared Jones at Central Indiana Orthopedics. Dkt. 41-1 at 6. Dr. Jones confirmed Mr. Hale's diagnosis, stating that he "advised [Mr. Hale] that if this fracture does not maintain alignment we may need to proceed with surgical treatment." *Id.* He placed Mr. Hale in an "external rotation sling" that would need removed for icing and bathing and scheduled him to return for a follow-up appointment in one and a half weeks and three weeks to take progression x-rays. *Id.* Further, he "advised [Mr. Hale] that we will write a script for narcotic pain meds but [he is] not sure [Mr. Hale] will be allowed to use th[em] in the prison environment and this will be up to the medical personnel in the prison." *Id.* The narcotic pain medications Dr. Jones prescribed were Tramadol and Hydrocodone. *Id.*

At his follow-up appointment on October 26, Dr. Jones noted that Mr. Hale "continue[d] to [complain of] significant pain and [was] focused on the inability to obtain narcotic pain meds." *Id.* at 9. He also changed the type of sling he gave Mr. Hale because he was "having difficulty with the ext[ernal] rotation sling after removing it for bathing." *Id.* Between appointments, medical and custody staff at CIF reported his continued non-compliance with wearing his sling. *Id.* at 13-15, 20, 22. Nurse McCord noted that on November 1, after offering to assist with putting his sling on, Mr. Hale "was able to assist" and "appeared to know how the sling was supposed to be worn properly." *Id.* at 14. Three days later, Nurse McCord visited Mr. Hale's cell after he requested assistance with his sling. Dkt. 123-1 at 32. Nurse McCord noted that he had an attitude and "became agitated and refused to help or answer [her] questions regarding comfort level" so she "advised hm that he could put it on himself" and left his cell. *Id.* The next day at medication pass,

4

Nurse McCord noted that Mr. Hale was not wearing his sling and that he "asked if [she] was going to help him put his sling on and continued to ramble obscenities and insulting remarks." *Id.* at 34. Mr. Hale states that neither Nurse Dodd nor Nurse McCord would help him put his sling on, dkt. 117-1 at 2, and that when they tried to put the slings on "they never put them on properly." Dkt. 127 at 2.

At his November 9 follow-up appointment, Mr. Hale's sling was again transitioned, this time to a traditional sling. Dkt. 41-1 at 24. He was also given a home exercise program, and he was told to use ibuprofen to reduce inflammation and pain. *Id.* On November 30, Dr. Jones noted he may discontinue use of his sling. *Id.* at 28. Further, his x-ray showed that "[t]he fracture appear[ed] to be well healed." *Id.* He was instructed to follow a physician guided home exercise program and was scheduled to return six weeks later. *Id.*

Mr. Hale was scheduled to begin his physical therapy the next day. *Id.* at 31. He refused to attend on December 1, 2, 3, 5, 6, and 7. *Id.* at 31-37. He attended his first session on December 10. *Id.* at 38. The facility Physical Therapist ("PT"), a non-party, adjusted the treatment plan to see Mr. Hale once a week for six weeks, for him to attend nurse-supervised home exercises in the infirmary three times a week for six weeks, and for him to complete home exercises daily in his cell. *Id.* at 43-44. Mr. Hale again refused to attend his exercises on December 15. *Id.* at 46. On December 18, shortly after midnight, he visited medical staff concerning his difficulty getting exercises completed. *Id.* at 47. When the nurse explained that his supervised exercises were reduced to thrice a week by the PT, Mr. Hale reportedly "became very irate that [prison medical staff] would change his orders and listen to a physical therapist and not his orthopedic doctor." *Id.* The nurse informed Mr. Hale that it was common for a PT to adjust treatment in this way between appointments with an orthopedist. *Id.* In response, he "started to talk about how he has been

5

medically neglected…. and that he would be contacting the prosecutor's office for legal assistance." *Id.*

During his next appointment, the PT noted that his pain was not resolving as anticipated with the current treatment and advised he should be referred back to an orthopedist for an MRI. *Id.* at 50. His referral to return to Dr. Jones was approved on December 27. *Id.* at 55. He was transferred to Pendleton Correctional Facility ("PCF") on January 14, 2022. *Id.* at 56-61.

### b.  Pendleton Correctional Facility

Shortly after arriving at Pendleton, Mr. Hale was in another altercation with inmates that further injured his left shoulder. *Id.* at 62. The nurse who treated him ordered an x-ray the same day. *Id.* at 66. He saw Dr. Jones again on February 1, 2022. *Id.* at 67. Dr. Jones noted Mr. Hale's lack of improvement with physical therapy and joined the PT's recommendation to proceed with an MRI to determine whether surgery would be needed, further noting that he is "under the impression" that it will be required. *Id.* Finally, Dr. Jones discontinued his prescriptions for narcotic pain relievers and stated that NSAIDs or Tylenol can be used for pain management now. *Id.* On February 18, Dr. Mershon, a non-party and a facility physician at Pendleton, submitted a treatment plan for Mr. Hale to continue physical therapy because Dr. Jones had "recommended MRI but also discussed [physical therapy] and injection." *Id.* at 71.

### c.  Miami Correctional Facility

On April 22, Mr. Hale was transferred again to a new facility, Miami Correctional Facility ("MCF"). *Id.* at 73. Shortly after his arrival, on May 12, he was again involved in an altercation with inmates, further injuring his left shoulder. *Id.* at 78. Another x-ray was ordered that evening. *Id.* at 79. The results indicated a "[r]esidual deformity humeral head from remote fracture" and "[n]o acute bony abnormality left shoulder." *Id.* at 82.

Mr. Hale saw non-party facility physician Dr. Kuenzli on May 25, who noted Mr. Hale previously had physical therapy for his shoulder and was recommended to have an MRI to determine whether surgery was necessary. *Id.* at 83. He further noted that Mr. Hale requested gabapentin; Dr. Kuenzli instead prescribed Tylenol 500 mg. *Id.* at 83-85. The next day, Dr. Kuenzli ordered an MRI per Dr. Jones' recommendation. *Id.* at 86-87.

Mr. Hale received the MRI at Dukes Memorial Hospital on June 7, 2022. *Id.* at 89. The results indicated that the fracture was not healed. *Id.* at 90. Dr. Kuenzli consulted with Dr. Jones, and they both approved scheduling an appointment for Mr. Hale to meet with a surgical specialist. Dkt. 91. He met with the non-party specialist, Dr. Jonathan Chae, on July 21. *Id.* at 92. Dr. Chae agreed "that it is possible he may need some sort of total shoulder arthroplasty possible reverse" but declined to treat him further because he did not perform such surgeries on patients as young as Mr. Hale. *Id.* Instead, he noted he would refer him to a different doctor who would perform such a surgery and give him a cortisone injection. *Id.* He also recommended 800 mg ibuprofen for pain management. *Id.* On August 3, Dr. Kuenzli requested an outpatient office visit with I Hand to Shoulder Center for Mr. Hale to meet with the physician Dr. Chae referred him to. *Id.* at 102-103.

### d. New Castle Correctional Facility

However, that same day, August 3, 2022, Mr. Hale was again transferred, this time to New Castle Correctional Facility ("NCCF"). *Id.* at 95. He saw Dr. Carter for the first time on August 9. *Id.* at 105. Dr. Carter noted that Mr. Hale had a fractured shoulder and that a request to see an orthopedist had been submitted by his previous physician. *Id.* at 106. He also noted that Mr. Hale felt "weird" when taking Tylenol and had previous success with Neurontin; he submitted a formulary exception request for Neurontin and prescribed ibuprofen in the interim. *Id.* at 106-07.

Mr. Hale was seen by non-party Dr. Janos Ertl, an orthopedist, on October 17. *Id.* at 109. Dr. Ertl noted that Mr. Hale's x-rays "demonstrated findings consistent with a healed proximal humerus fracture, which is malunited." *Id.* at 110. He also noted atrophy in the left shoulder. *Id.* at 110. Dr. Ertl recommended a CT scan of the proximal humerus, an EMG to evaluate the bilateral upper extremities, and an injection for pain. *Id.* He gave Mr. Hale the injection and submitted the CT scan request the same day. *Id.* at 112-13. Dr. Ertl further opined that "[i]t is doubtful that an osteotomy and surgical intervention would regain [Mr. Hale's] current range of motion. As discussed previously, [Mr. Hale] may require total joint arthroplasty at some point in the future." *Id.* at 111.

On November 29, Mr. Hale saw Dr. Carter. *Id.* at 114. He noted that requests had been placed for both the CT scan and EMG and were waiting approval. *Id.* at 115-18. On December 4, Mr. Hale was placed on close observation suicide watch. *Id.* at 119. Dr. Carter submitted a second request for Mr. Hale's tests on December 12, stating "WE ALREADY APPROVED ORTHO CONSULT, this is THEIR recommendation…. again, we approved ortho consult, this is what the orthopedic expert has asked for to further evaluate the patient." *Id.* at 125. Mr. Hale was removed from close observation suicide watch on December 29. *Id.* at 127. On January 15, 2023, he tested positive for COVID-19 and began isolation. *Id.* at 134. Mr. Hale was scheduled to see Dr. Carter on February 2, but Dr. Carter needed to reschedule the appointment. *Id.* at 139. Instead, he saw him on February 14. *Id.* at 140. Dr. Carter noted that Mr. Hale's CT scan needed to be rescheduled because his original appointment conflicted with his time on suicide watch and had to be rescheduled. *Id.* at 141. Mr. Hale received the CT scan on July 17, 2023. *Id.* at 144. His EMG was scheduled for August 14, 2023, but Mr. Hale was injured during transportation and the test was not done. Dkts. 123-1 at 42-46; 117-1 at 3.

8

Mr. Hale had a psychotherapy appointment on August 18, 2023, where non-party MHP Heimann noted he "appears to be manipulative." Dkt. 123-1 at 46. On September 20, his PT noted that he was "refusing to function independently" and stated in his findings that "[p]ossibly patient has been trying to manipulate the system into thinking he was injured, a story that would lead to his dependency on [wheelchair] and accomplish other of his manipulatory intentions." *Id.* at 53-56.

### e. Westville Correctional Facility

In February 2024, Mr. Hale was transferred to Westville Correctional Facility ("WCF"). Dkt. 78. Two months later, he received his EMG. Dkt. 117-1 at 3. He then saw non-party orthopedist Dr. Yahuaca on May 29. Dkt. 122 at 4-8. Dr. Yahuaca discussed surgical and nonsurgical treatment options with Mr. Hale. *Id.* at 5. Dr. Yahuaca noted Mr. Hale's preference for surgical management but decided to "start with conservative management and try corticosteroid injection." *Id.* On June 4, Dr. Yahuaca sent a fax to Mr. Hale's Centurion physician, Dr. Liaw, with the comment "surgery – reverse lt shoulder arthroplasty." *Id.* at 3.

## III.
## Discussion

The Eighth Amendment's prohibition against cruel and unusual punishment imposes a duty on the states, through the Fourteenth Amendment, "to provide adequate medical care to incarcerated individuals." *Boyce v. Moore*, 314 F.3d 884, 889 (7th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials can be liable for violating the Eighth Amendment when they display deliberate indifference towards an objectively serious medical need." *Thomas v. Blackard*, 2 F.4th 716, 721–22 (7th Cir. 2021). "Thus, to prevail on a deliberate indifference claim, a plaintiff must show '(1) an objectively serious medical condition to which (2) a state official was deliberately, that is subjectively, indifferent.'" *Johnson v. Dominguez*, 5 F.4th

9

818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)).

The Court assumes for purposes of the summary judgment motion that Mr. Hale's broken shoulder was objectively serious. To avoid summary judgment, then, the record must allow a reasonable jury to conclude that the defendants acted with deliberate indifference—that is, that they "consciously disregarded a serious risk to [Mr. Hale]'s health." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 241 (7th Cir. 2021) (cleaned up).

Deliberate indifference requires more than negligence or even objective recklessness. *Id*. Rather, Mr. Hale "must provide evidence that an official actually knew of and disregarded a substantial risk of harm." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). "Of course, medical professionals rarely admit that they deliberately opted against the best course of treatment. So in many cases, deliberate indifference must be inferred from the propriety of their actions." *Dean*, 18 F.4th at 241 (internal citations omitted).

The Seventh Circuit has held that deliberate indifference occurs when the defendant:

- renders a treatment decision that departs so substantially "'from accepted professional judgment, practice, or standards as to demonstrate that'" it is not based on judgment at all. *Petties*, 836 F.3d at 729 (quoting *Cole v. Fromm*, 94 F.3d 254, 260 (7th Cir. 1996)).

- refuses "to take instructions from a specialist." *Id.*

- persists "in a course of treatment known to be ineffective." *Id.* at 729–30; *Thomas v. Martija*, 991 F.3d 763, 772 (7th Cir. 2021).

- chooses "an 'easier and less efficacious treatment' without exercising professional judgment." *Petties*, 836 F.3d at 730 (quoting *Estelle*, 429 U.S. at 104 n.10).

- effects "an inexplicable delay in treatment which serves no penological interest." *Id.*

10

The Court examines the totality of Mr. Hale's medical care when evaluating whether the defendants were deliberately indifferent. *Wilson v. Adams*, 901 F.3d 816, 821 (7th Cir. 2018).

Mr. Hale alleges Nurses Dodd and McCord were deliberately indifferent by refusing to assist him with wearing his sling properly and Dr. Carter was deliberately indifferent by preventing him from getting surgery on his shoulder and not administering proper pain medication. Dkts. 20, 27.

### a. Nurses Dodd and McCord

Mr. Hale alleges Nurses Dodd and McCord were deliberately indifferent to the medical needs of his broken shoulder because they would not help him put his slings on properly. Dkt. 27 at 3. Mr. Hale's medical records do not indicate that Nurse Dodd was involved in the proper placement of Mr. Hale's sling at any point. Dkt. 41-1. They do indicate she attempted to assist him with his shoulder exercises on multiple occasions, but he continuously refused her help. *Id.* at 33, 36-37, 46. Regarding Nurse McCord, his records indicate that she both assisted him with proper sling placement at times and refused to assist him at other times due to his attitude. *Id.* at 14; dkt. 123-1 at 32-34. However, her documented refusals all occurred after she observed Mr. Hale place his sling on himself properly. *Id.* Further, his medical records reflect that Mr. Hale was consistently non-compliant with keeping his sling on even when directed to do so by medical staff. Dkt. 41-1 at 13-15, 20, 22.

Mr. Hale argues that his medical records are falsified, but also contradicts himself at points by stating both that Nurses Dodd and McCord would not assist him and that they would try to assist him but "they never put [the slings] on properly." Dkts. 117-1 at 2, 127 at 2.

11

Medical records do not constitute an indisputable objective record of medical treatment, and thus are not entitled to any more weight than Mr. Hale's testimony. *See Pritt v. Correct Care Sols.,* No. 1:17-CV-02664-JPH-MPB, 2020 WL 2840027, at *2 (S.D. Ind. June 1, 2020); *Lemond v. Talbot*, No. 2:17-CV-00113-WTL-DLP, 2018 WL 2938496, at *4 (S.D. Ind. June 12, 2018) ("Observations recorded in a medical record are entitled to no more weight than observations recorded in an affidavit for purposes of resolving a summary judgment motion."). However, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380-381 (2007). As the non-movant, Mr. Hale receives the "benefit of reasonable inferences from the evidence, but not speculative inferences in his favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (cleaned up).

Because Mr. Hale's own testimony comports with his medical records—i.e., that the nurses tried to help him with his sling on several occasions, no jury could reasonably find that Nurse Dodd and Nurse McCord "knew of and disregarded a substantial risk of harm" to Mr. Hale's shoulder by refusing to assist him with him slings. *Petties*, 836 F.3d at 728. Accordingly, they are entitled to summary judgment on these claims.

    **b. Dr. Carter**

Mr. Hale alleges that Dr. Carter was deliberately indifferent by preventing him from getting surgery on his shoulder and not administering proper pain medication. Dkt. 20. Dr. Carter treated Mr. Hale for the first time on August 9, 2023, after he was transferred to NCCF. Dkt. 41-1 at 95, 105. Dr. Carter noted that a request to see an orthopedist for his shoulder was already submitted by Mr. Hale's previous physician. *Id.* at 106. He also submitted a formulary exception request for

12

Neurontin to treat Mr. Hale's pain because he reported feeling "weird" when taking Tylenol but had previous success with Neurontin. *Id.* at 106-107. Dr. Carter also prescribed ibuprofen while the request for Neurontin was pending. *Id.* at 107.

Dr. Carter next saw Mr. Hale on November 29, after Mr. Hale saw the orthopedist. *Id.* at 114. He noted that, per the orthopedist's request, he had submitted requests for a CT scan and an EMG and they were awaiting approval. *Id.* at 115-118. The original CT scan appointment was cancelled, pending rescheduling, because Mr. Hale was on suicide watch at the time. *Id.* at 141. Dr. Carter submitted a second request on December 12 for the two tests to be scheduled, stating "WE ALREADY APPROVED ORTHO CONSULT, this is THEIR recommendation…. again, we approved ortho consult, this is what the orthopedic expert has asked for to further evaluate the patient." *Id.* at 125.

Mr. Hale received the CT scan on July 17, 2023. *Id.* at 144. His EMG was scheduled for August 14, 2023, but Mr. Hale was injured during transportation and the test was not done. Dkts. 123-1 at 42-46; 117-1 at 3. In February 2024, Mr. Hale was transferred to WCF, dkt. 78, and Dr. Carter stopped being his physician. Mr. Hale received the EMG in April 2024. Dkt. 117-1 at 3.

Mr. Hale alleges that Dr. Carter delayed his care by "not getting [him] timely scheduled for [his] testing [sic] CT scan and EMG testing and fail[ing] to prescribe gabapentin." *Id.* at 2.

"Summary judgment is not a time to be coy: conclusory statements not grounded in specific facts are not enough." *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018) (cleaned up). The record clearly reflects that Dr. Carter regularly requested scheduling and re-scheduling of Mr. Hale's CT scan and EMG, indicting the tests were required in order for Mr. Hale to receive surgery. Dkt. 41-1 at 114-118, 125, 141-144. While there clearly was a delay in getting the tests completed, the record indicates it was caused by Mr. Hale being placed on suicide watch, Mr. Hale contracting

13

COVID-19, Mr. Hale being injured during transportation, and time spent awaiting approval by Centurion, not by any deliberate indifference on the part of Dr. Carter. *Id.* at 119, 127, 134, 141-143; dkt. 123-1 at 42-46.

As for Mr. Hale's allegation that Dr. Carter refused to prescribe him gabapentin, the record clearly indicates that is simply not true. Neurontin is a brand name for the generic drug gabapentin.[3] On the first day that Dr. Carter began treating Mr. Hale, he submitted a formulary exception request for Neurontin. Dkt. 41-1 at 107. Mr. Hale's medical records indicate that he began taking Neurontin on November 15, 2022, with an anticipated stop date of February 12, 2023. *Id.* at 115, 117, 125. Dr. Carter renewed the prescription, with a start date of February 13, 2023, and an anticipated stop date of May 13, 2023. *Id.* at 141. He then renewed it again, with a start date of May 15, 2023, and an anticipated stop date of August 12, 2023. *Id.* at 143.

There is nothing in the record that indicates Dr. Carter acted subjectively indifferent, persisted in treatment he knew was ineffective, or departed substantially from accepted medical practice in treating Mr. Hale's broken shoulder. Accordingly, he is entitled to summary judgment.

    **c. Centurion**

Mr. Hale is only proceeding against Centurion on claims for prospective injunctive relief. Dkt. 27 at 8. "A preliminary injunction is an extraordinary equitable remedy that is available only when the movant shows clear need." *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015). To obtain a preliminary injunction a plaintiff first must show that: "(1) without this relief, [he] will suffer irreparable harm; (2) traditional legal remedies would be inadequate; and (3) [he] has some likelihood of prevailing on the merits of [his] claims." *Speech First, Inc. v. Killen*, 968 F.3d 628, 637 (7th Cir. 2020). If the plaintiff meets these threshold requirements, "the court then

---

[3] The Court takes judicial notice of this fact. https://www.drugs.com/neurontin.html (last visited March 21, 2025).

must weigh the harm the denial of the preliminary injunction would cause the plaintiff against the harm to the defendant if the court were to grant it." *Id.* "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490. 501 (7th Cir. 2020) (cleaned up).

Viewing the totality of the treatment Mr. Hale has received by Centurion employees (both the named defendants and non-parties at various IDOC facilities), no factfinder could conclude that he is entitled to injunctive relief. *Wilson*, 901 F.3d at 821. Mr. Hale has received treatment in the form of slings, pain medication, physical therapy, and referrals to outside providers. Centurion employees have followed the advice of outside providers. That Mr. Hale continues to suffer pain is due to a combination of factors including the complexity of his injury, his non-compliance with medical providers' treatment orders, and several fights with other inmates that have exacerbated the injury. Because Mr. Hale has not proven he received inadequate medical care by any Centurion employee, he cannot prove that he is entitled to any prospective injunctive relief. *Vaughn v. Walthall,* 968 F.3d 814, 824-25 (7th Cir. 2020) ("Since a permanent injunction is a form of relief on the merits, the plaintiff must also show not just a probability of success on the merits but actual success"). Accordingly, Centurion is entitled to summary judgment on this claim.

## IV.
## Motion to Strike

Mr. Hale has filed a motion to dismiss Defendants' motion for summary judgment, which the Court construes as a motion to strike. Dkt. 125. He argues that Defendants falsified Court documents in an effort to manipulate the Court into ruling in favor of Dr. Carter on summary judgment. *Id.* at 1. Specifically, he states that Defendants made a false statement that Mr. Hale received an EMG on August 14, 2023. *Id.* at 2. He asserts that he was scheduled to obtain the test that day, but never did because he was injured during transportation. *Id.*

Defendants addressed the discrepancy Mr. Hale notes in their reply brief. Dkt. 124 at 14-15. They indicate that their counsel initially received confirmation that Mr. Hale's EMG occurred on August 14, but upon seeing Mr. Hale's response brief, "immediately began investigating the matter" further. *Id.* at 14. Their counsel contacted a facility staff member, who reviewed correctional records reflecting that Mr. Hale was transported to the appointment at 1:21 PM and returned to the facility at 4:42 PM. *Id.* Additional records reflected that the hospital rescheduled the EMG for August 30, but at that time Mr. Hale was "refusing to walk, stating he cannot walk because he claims he was injured during an incident with custody." *Id.* at 15.

The Defendants provided documentary evidence supporting why they believed their original statement that Mr. Hale received his EMG on August 14 was true, and later provided a thorough description of their investigation into the facts when provided conflicting evidence from Mr. Hale. *Id.* at 14-15. There is no support for Mr. Hale's allegation that Defendants purposefully falsified documents. Indeed, Defendants filed their explanation of their investigation into the discrepancy prior to Mr. Hale filing his motion.

As there is no support for Mr. Hale's allegations, his motion, dkt. [125], is **denied.**

## V.
## Motion for Expedited Ruling

Additionally, Mr. Hale filed a motion seeking an expedited ruling on his motion for a preliminary injunction. That motion, dkt. [137], is **denied** because there is no pending motion for preliminary injunctive relief in this matter.

## VI.
## Summary

In sum, Defendants' motion for summary judgment, dkt. [106], is **granted**. Mr. Hale's motion to dismiss, which the Court construes as a motion to strike, and his motion for an expedited ruling are **denied**. Dkts. [125], [137].

Final judgment will issue in a separate entry.

**SO ORDERED.**

Dated:  March 21, 2025

Matthew P. Brookman, Judge
United States District Court
Southern District of Indiana


Distribution:

MICHAEL HALE
884687
MIAMI - CF
MIAMI CORRECTIONAL FACILITY
Inmate Mail/Parcels
3038 West 850 South
Bunker Hill, IN 46914-9810

Jeb Adam Crandall
BLEEKE DILLON CRANDALL ATTORNEYS
jeb@bleekedilloncrandall.com

Travis W. Montgomery
Bleeke Dillon Crandall, P.C.
travis@bleekedilloncrandall.com